# IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

# CENTRAL DIVISION

| | |
|---|---|
| URANIUM WATCH, CENTER FOR WATER ADVOCACY, and LIVING RIVERS,<br><br>Plaintiffs,<br><br>vs.<br><br>UNITED STATES FOREST SERVICE, and PAMELA BROWN, in her official capacity as Forest Supervisor for the Manti-La Sal National Forest,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER DENYING PRELIMINARY INJUNCTION**<br><br>Case No. 2:10CV721DAK<br><br>Judge Dale A. Kimball |

This matter is before the court on Plaintiffs Uranium Watch, Center for Water Advocacy, and Living Rivers' Motion for Temporary Restraining Order and Preliminary Injunction seeking to stay the construction of two additional vent holes and the ground disturbance associated with the drilling of sixteen exploration holes by Denison Mines Corporation (USA) at its Pandora Mine located in the Manti-La Sal Forest. The United States Forest Service approved the two projects in a Decision Memo dated April 14, 2010.

Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction was fully briefed by the parties. The court then held a preliminary injunction hearing on September 2, 2010. At the hearing, Plaintiffs were represented by Joro Walker, Eric Jantz, and Roger Flynn, Defendants United States Forest Service and Pamela Brown were represented by Jared C. Bennett and Daniel Price, and Intervenors Denison Mines (USA) Corp and Denison Colorado

Plateau LLC were represented by Michael A. Zody and Elizabeth A. Schulte. The court took the preliminary injunction motion under advisement. The court has carefully considered the memoranda, exhibits, declarations, and other materials submitted by the parties, the administrative record, the arguments advanced by counsel at the hearing on the motion, and the law and facts relevant to the motion. Now being fully advised, the court renders the following Memorandum Decision and Order.

## I. BACKGROUND[1]

In July 2009, Denison notified the Forest Service that it wanted to install more vent holes and conduct more exploratory drilling in connection with its Pandora Mine. An approved plan of operation had been in place for the Pandora Mine since 1981. Because the plan of operations had been modified on at least two previous occasions, the Forest Service requested that Denison provide the Forest Service with all of its future plans for the mine so it could do an all-encompassing environmental document instead of analyzing each item separately. Denison responded that such a long-term outlook was difficult because of the sinuous pattern of the uranium deposits. This winding uranium ore body is what prompted Denison to request the project for exploratory drill holes.

On July 22, 2009, Denison formally submitted a proposal to amend its plan of operations by installing two vent holes and drilling sixteen exploratory holes. The plan stated that the proposed vent holes will intersect with existing and planned mine workings, would be

---

[1] The court notes that the findings of fact and conclusions of law made by a court in deciding a preliminary injunction motion are not binding at the trial on the merits. *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981); *City of Chanute v. Williams Natural Gas Co.*, 955 F.2d 641, 649 (10th Cir. 1992), *overruled on other grounds, Systemcare, Inc. v. Wang Labs Corp.,* 117 F.3d 1137 (10th Cir. 1997) (recognizing that "the district court is not bound by its prior factual findings determined in a preliminary injunction hearing.").

approximately six feet in diameter, and create a total surface disturbance of .5 acres. An additional .79 acre surface disturbance would occur from building or repairing access roads to the vent hole area. Thus, the total surface disturbance for the vent hole project is 1.29 acres.

Denison's plan further stated that the 16 exploratory drill holes would surround existing and planned mine workings, would be six inches in diameter, and be drilled to a depth of 600 feet. The surface disturbance would be .29 acres for the drill holes and 1.09 acres for road access. The surface disturbance then would be reclaimed by backfilling the holes and seeding the previously disturbed area for vegetation recovery after one to two months if it could be completed during that mining season or at the beginning of the next mining season.

An amendment to a plan of operations for mines on federal land must comply with the National Environmental Policy Act ("NEPA"), among other acts. To approve a project under NEPA, the Forest Service must (1) prepare an environmental impact statement ("EIS"), (2) do an environmental assessment ("EA") to see if an EIS is necessary, or (3) determine that the action falls under a categorical exclusion. In this case, the Forest Service approved both of Denison's requested projects under categorical exclusions.

A "categorical exclusion" means "a category of actions which do not individually or cumulatively have a significant effect on the human environment . . . and for which, therefore, neither an environmental assessment nor an environmental impact statement is required." 40 C.F.R. § 1508.4. The Forest Service has promulgated regulations that designate specific categories of actions for which no EA or EIS are required. 36 C.F.R. § 220.6 (2009).

Categorical exclusion 3 is defined as: "approval, modification, or continuation of minor special uses of NFS lands that require less than five contiguous acres of land. Examples include, but are not limited to: . . . (iv) Approving the use of land for a 40-foot utility corridor that crosses

one mile of national forest; . . . (viii) Approving the removal of mineral materials from an existing community pit or common-use area."

Categorical exclusion 8 applies to: "Short-term (1 year or less) mineral, energy, or geophysical investigations and their incidental support activities that may require cross-country travel by vehicles and equipment, construction of less than 1 mile of low standard road, or use and minor repair of existing roads." Examples under this exclusion include "(i) Authorizing geophysical investigations which use existing roads that may require incidental repair to reach sites for drilling core holes, temperature gradient holes, or seismic shot holes; . . . (iii) Trenching to obtain evidence of mineralization; (iv) Clearing vegetation for sight paths or from areas used for investigation or support facilities; . . . (vii) Approving a plan for exploration which authorizes repair of an existing road and the construction of 1/3 mile of temporary road; clearing vegetation from an acre of land for trenches, drill pads, or support facilities."

After conducting its NEPA review of the requested projects, the Forest Service determined that the two venting holes fell under categorical exclusion 3 and the exploratory drill holes fell under categorical exclusion 8. Because the Forest Service determined that Denison's amended plan of operations fit within these categorical exclusions, it was not required to complete an EIS or EA before approving the requested projects.

The Forest Service then advertised a 30-day public comment period in the newspaper and on the Forest Service's website. On October 21, 2009, Sarah Fields from Uranium Watch contacted the Forest Service to ask questions about the two proposed projects. On October 26, 2009, Uranium Watch submitted written comments to the proposed plan of operations. In its comment letter, Uranium Watch listed several concerns, including whether extraordinary circumstances would preclude the application of the categorical exclusions.

The Forest Service provided Uranium Watch with written responses to each of its comments. After considering all of the stated concerns, the Forest Service determined that none of them precluded the use of the categorical exclusions to approve the projects. But, based on some of the comments, the Forest Service decided to alter the design of the proposed projects to reduce surface impacts. Additionally, the Forest Service agreed to allow Denison to move 10 of its 16 drill holes from their proposed locations to previously disturbed areas on or near Forest Service roads. The Forest Service and the State of Utah also required Denison to obtain a reclamation bond in the amount of $175,811 to ensure that Denison would be able to pay for the reclamation of the affected area. Denison has obtained that bond.

Plaintiffs were not satisfied with the responses they received or with the modifications to the projects and filed this action under the Administrative Procedures Act, 5 U.S.C. § 706(2)(A), for review of the Forest Service's determination.

In December 2009, which was after Uranium Watch submitted its comments to the Forest Service but before the Forest Service responded to those comments, Denison submitted a proposed amendment to the BLM to expand mining operations in all of its mines in the area, including Pandora Mine. That proposed amendment was pending when the Forest Service made its decision on the proposed amendment at issue in this case. That proposed amendment remains pending.

## DISCUSSION

Plaintiffs seek a preliminary injunction to stop the commencement of the venting and exploration projects, arguing that potential environmental harm may occur because the Forest Service improperly approved of the projects under categorical exclusions rather than conducting an EA or EIS. To obtain preliminary injunctive relief, Plaintiffs must show: (1) a substantial

5

likelihood of success on the merits; (2) irreparable harm if the injunction is not issued; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the defendant; and (4) the injunction will not adversely affect the public interest. *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067 (10th Cir. 2009).

**A. Likelihood of Success on the Merits**

Plaintiffs argue that they are likely to prevail on the merits of the case because the Forest Service has failed to consider the cumulative impacts of the proposed projects under NEPA and has improperly avoided environmental review under NEPA by invoking categorical exclusions. The Forest Service responds that it conducted a full NEPA review when it issued a twenty-two page analysis supporting its determination, its determination to use categorical exclusions is entitled to deference, and it is not required to consider cumulative impacts when projects fall within categorical exclusions.

Because NEPA does not provide for a private right of action, federal courts review claims that the Forest Service has violated NEPA under the APA. Under Section 706 of the APA, this court is charged with determining, based on the record before the Forest Service, whether the Forest Service's decision to approve the projects was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Utah Environmental Congress v. Zeiroth*, 190 F. Supp. 2d 1265, 1267-68 (D. Utah 2002). This standard applies to an agency's application of a categorical exclusion. *Citizen's Comm. to Save Our Canyons v. United States Forest Serv.*, 297 F.3d 1012, 1023 (10th Cir. 2002) ("Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision is arbitrary and capricious."). "When reviewing an agency's interpretation and

6

application of its categorical exclusions under the arbitrary and capricious standard, courts are deferential." *Id.*

In applying the arbitrary and capricious standard, this court must determine whether the "decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971). This court cannot substitute its judgment for that of the Forest Service. Forest officials are charged with using their expertise to consider environmental factors and so long as that agency discretion is rationally exercised, it should not be second guessed by the courts. *See Norton v. Southern Utah Wilderness Association*, 124 S. Ct. 2373, 2381 (2004).

### 1. *Cumulative Impacts*

Plaintiffs rely on several Ninth Circuit cases stating that the Forest Service must consider cumulative impacts before categorically excluding an action. NEPA regulations limit the type of activities that can be considered categorical exclusions by defining the term to mean "a category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. The Forest Service argues that, as a matter of law in the Tenth Circuit, the Forest Service does not have to analyze cumulative impacts when relying on a categorical exclusion.

In *Utah Environmental Congress v. Bosworth*, 443 F.3d 732 (10th Cir. 2006), the Tenth Circuit expressly rejected the plaintiff's argument that the Forest Service had to consider the cumulative impacts of a project when using a categorical exclusion. After noting that the definition of categorical exclusion means the actions do not individually or cumulatively have a significant effect on the human environment, the court reasoned that "[b]y definition, then, a categorical exclusion does not create a significant environmental effect." *Id.* at 741.

"[C]onsequently, the cumulative effects analysis required by an environmental assessment need not be performed." *Id.*

While Plaintiffs rely on case law from the Ninth Circuit, in the Tenth Circuit, the Forest Service does not need to consider cumulative impacts when relying on a categorical exclusion. Therefore, Plaintiffs have not established a likelihood of success on the merits of this claim.

### 2. *Connected Actions*

Plaintiffs also argue that the two projects should have been considered as "connected actions" with Denison's existing and/or proposed mining operations. "[A]n agency is required to consider more than one action in a single EIS if they are 'connected actions,' 'cumulative actions,' or 'similar actions.'" *Kleppe v. Sierra Club*, 427 U.S. 390, 408 (1976). The Forest Service acknowledges that NEPA requires it to consider whether the action it is evaluating is "connected" to another action. Courts apply an "independent utility test" to determine whether two actions are connected and, therefore, should be analyzed in one environmental document. *Wilderness Workshop v. Bureau of Land Management*, 531 F.3d 1220, 1228 (10th Cir. 2008). "The crux of the test is whether each of the two projects would have taken place with or without the other and thus has independent utility." *Id*. at 1229.

First, Plaintiffs argue that the requested projects are connected to Denison's existing mine operations. The Forest Service acknowledges that the vent holes are necessary to meet Mine Safety and Health Administration requirements for the existing mining operations and that both projects are in support of the mining operations at the Pandora Mine. The Forest Service, however, argues that the connected action analysis only applies to future actions.

In *Wilderness Workshop v. United States Bureau of Land Management*, 531 F.3d 1220, 1229 (10th Cir. 2008), the court stated that "[i]t is important to note that 'projects,' for purposes

of NEPA, are described as 'proposed actions,' or proposals in which action is imminent." *Id.* at 1229 (citation omitted). This language from the Tenth Circuit suggests that connected actions refer to proposed future plans. But, the court was not addressing the issue in the context of an existing operation that already had an environmental assessment. Rather, the court was addressing how reasonably foreseeable the future action was and whether the future plans had actually reached a proposal stage. Therefore, it is unclear whether *Wilderness Workshop* can actually be read for the proposition that connected actions are only future plans.

The Forest Service argued at the hearing that it is not required to redo an EIS or EA for every minor project that may be connected to the EIS and EA. As an example, the Forest Service argues that small improvements at an airport that can fit within a categorical exclusion do not require an agency to reevaluate the original EIS or EA for the airport. Neither party has cited to case law involving such a situation. The Forest Services' argument, however, intuitively makes sense. The court, therefore, concludes that at the preliminary injunction stage, Plaintiffs have not demonstrated that its argument that the new projects are connected to the existing mine operations would provide grounds for reversing the Forest Service's decision regarding the use of categorical exclusions.

Next, Plaintiffs argue that the two proposed projects are connected to Denison's future plan of operations currently pending before the BLM. The Forest Service argues that the vent holes and exploratory drill holes both have independent utility from the future plan of operations currently pending before BLM.

Regardless of whether the BLM allows for a general expansion of mining operations, the vent holes are required to meet mine safety regulations. Therefore, the vent hole project clearly has independent utility. As to the exploration holes, Denison does not appear to need that

9

information in relation to its separate proposals submitted to the BLM. Prior to receiving Denison's requested proposals at issue in this case, the Forest Service requested that Denison provide its future plans for the entire mine that may impact the Forest Service in any way so that the Forest Service could do an all encompassing environmental document instead of analyzing each item separately. Denison stated, however, that it could not provide such a future plan because of the difficulties presented by the "sinuous pattern" of the uranium deposits within the Pandora Mine. It submitted the two proposed projects in relation to only the current mining operations, not the requested expansions requested in the new proposed amendment. There does not appear to be any evidence in the record that the separate amendment submitted to the BLM relies in any way on receiving information from current exploration hole project. And there is no evidence in the administrative record that this project would not exist but for the BLM's approval of the expansion of all the mining operations. The court, therefore, concludes that Plaintiffs have not met their burden of demonstrating that the proposed projects are connected activities with the future expansion plans pending with the BLM.

### 3. *Categorical Exclusion 3*

Plaintiffs further argue that the Forest Service's reliance on categorical exclusion 3 to avoid full NEPA review of the vent hole project is plainly erroneous because categorical exclusion 3 is only applicable to "minor special uses." Plaintiffs, however, contend that "minor special uses" does not apply to mineral operations approved under the 1872 Mining Law and the Forest Service's mining regulations.

The Forest Service's interpretation of the term "minor special uses" in categorical exclusion 3 is entitled to controlling weight because the plain language of the regulation does not compel the Forest Service to interpret "minor special use" as a synonym of "special use" as that

10

term is defined in 36 C.F.R. § 250.51. As Plaintiffs correctly point out, a mining activity approved under 36 C.F.R. Part 228 – including plans of operations – cannot be a "special use" under 36 C.F.R. § 250.51. However, the plain language of categorical exclusion 3 shows that mining activities subject to approval under 36 C.F.R. Part 228 are "minor special uses." Categorical exclusion 3 provides that a "minor special use" includes "[a]pproving the removal of mineral materials from an existing community pit or common-use area." 36 C.F.R. 226.6(e)(3)(vii). The removal of mineral materials from a community pit or common use areas is subject to approval under 36 C.F.R. Part 228 subpart C. 36 CFR §§ 228.47 to 228.61 (2009).

Given that the term "minor special uses" includes mining activities that are subject to approval under 36 C.F.R. Part 228, it cannot be a synonym of "special uses" as that term is used in the special use permit regulations. 36 C.F.R. § 250.51. Moreover, this reading is bolstered by the fact that categorical exclusion 3 never references the special use regulations. Consequently, the court concludes that Plaintiffs have failed to demonstrate that the Forest Service's interpretation is not entitled to controlling weight.

Under categorical exclusion 3, a "minor special use" is an activity that requires "less than five contiguous acres of land." 36 C.F.R. § 220.6(e)(3). As the record shows, the construction and operation of the vent holes will only require 1.29 acres of land. In fact, in answer to public comment, the Forest Service stated that the two vent holes will actually leave less of an environmental footprint than a 40-foot utility corridor, which is also a "minor special use" under categorical exclusion 3. 36 CFR 220.6(e)(3)(iv). Accordingly, the court concludes that Plaintiffs have not met their burden of demonstrating that they are likely to reverse the Forest Service's determination to apply categorical exclusion 3 to approve the two vent holes at issue.

### 4. *Categorical Exclusion 8*

Plaintiffs further argue that the Forest Service improperly used categorical exclusion 8 to approve the exploration drilling holes project because categorical exclusion 8 can only be used for routine actions involving short-term investigations of one year or less. Plaintiffs assert that the drilling holes project in this case is neither routine nor short-term.

The Forest Service argues that Plaintiffs' claim that categorical exclusion 8 does not apply because the exploratory drill holes are not "routine" is legally and practically without merit. As a matter of law, the word "routine" is not used in categorical exclusion 8. 36 C.F.R. § 220.6(e)(8). Thus, it is not a regulatory requirement that the Forest Service must meet in order to rely on categorical exclusion 8. *See Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 524 (1978) (holding that reviewing courts are not free to impose additional requirements in agency regulations "if the agencies have chosen not to grant them").

Assuming that "routine" is a requirement to invoke categorical exclusion 8, the Forest Service argues that sixteen exploratory drill holes meet that requirement. The Administrative Record shows that the Forest Service has approved over 30 exploratory drill holes in the past three years for the Pandora Mine alone. Moreover, the Forest Service has approved several other drilling projects in other parts of the forest for mineral exploration.

Second, Plaintiffs' argument that the exploratory holes will remain longer than one year has no support in the Administrative Record. The record shows that the holes will be reclaimed within one month of being drilled, unless inclement weather postpones reclamation "until the following season." However, "the following season" does not mean "after one year." The project allows Denison to work from May 15 to October 30. If Denison had to stop drilling on October 30, it would be able to begin its reclamation work in May, which is well within a year. The court, therefore, concludes that Plaintiffs have not demonstrated a likelihood of success on

the merits of their appeal to reverse the Forest Service's use of categorical exclusion 8 to approve the exploration hole project.

**B. Irreparable Harm**

Plaintiffs argue that environmental injury is generally irreparable. However, because Plaintiffs have failed to establish a likelihood of success on the merits of their NEPA claim, the court cannot presume that Plaintiffs are *per se* harmed. *Amoco Production Company v. Village of Gambell*, 480 U.S. 531, 545 (1987); *Davis v. Mineta*, 302 F.3d 1104, 1115 & n.6 (10th Cir. 2002). Plaintiffs must clearly and convincingly meet this element as well as the other four traditional factors for the issuance of preliminary injunctive relief.

Plaintiffs submit declarations stating that the ability to recreate in the area will be significantly and irreparably harmed. These declarations are too conclusory to establish factual injury. They merely parrot the legal requirements. Plaintiffs have also submitted the Declaration of Melinda Ronca-Battista, stating that the vent hole and exploration hole projects are likely to result in the release of radioactive air emissions and toxic heavy metal substances to the environment in excess of the regulatory limits. Ms. Ronca-Battista, however, has done no independent analysis. Denison has submitted the Declaration of Douglas B. Chambers. Dr. Chambers is an expert in radon and has first-hand knowledge of the Pandora Mine, having visited the mine and conducted risk assessment work at the mine. Dr. Chambers opines that the two vent holes and sixteen drill holes will not present any significant risk of harm to Plaintiffs, members of the public, or the environment. At this stage, the court finds Dr. Chambers' testimony more persuasive and credible. Plaintiffs' evidence is conjectural and factually unsupported.

In addition, Plaintiffs claim that they will suffer irreparable procedural harm from the

Forest Service's failure to comply with NEPA procedures. "In mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment." *Davis v. Mineta*, 302 F.3d at 1114-15. "In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *High Sierra Hikers*, 390 F.3d at 642. The court, however, finds this argument without merit. The evidence at this stage of the litigation demonstrates that the Forest Service met its obligations under NEPA. The Forest Service issued a twenty-two page analyzing the proposed projects. After conducting its NEPA review, the Forest Service determined that the proposed projects fell within categorical exclusions. The Forest Service made the public aware of its decision and responded to all of Plaintiffs' comments. It is disingenuous in this case to claim that the Forest Service failed to conduct a NEPA review. Plaintiffs merely disagree with the outcome of the Forest Service's NEPA review. The court concludes there is no basis for finding procedural harm.

The court, therefore, concludes that Plaintiffs have not clearly and convincingly established that they will suffer irreparable injury if the preliminary injunction is not issued. Because the court finds that Plaintiffs have failed to establish the first two elements for preliminary injunctive relief, the court concludes that there is no need to analyze the remaining two factors.

### III. CONCLUSION

For the foregoing reasons, Plaintiffs' motion for preliminary injunction is DENIED. Plaintiffs have not clearly and unequivocally demonstrated that they are likely to succeed on the merits of their claims or that there is irreparable harm.

DATED this 14th day of September, 2010.

                        BY THE COURT:

                        _____
                        DALE A. KIMBALL
                        United States District Judge